Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL ESPECIAL**

| | | |
|---|---|---|
| El Pueblo de Puerto Rico<br><br>Apelado<br><br>vs.<br><br>Salil A. Zaveri<br><br>Apelante | KLAN202300386 | **APELACIÓN**<br>procedente del Tribunal de Primera Instancia, Sala Superior de Fajardo<br><br>Crim. Núm.:<br>NSCR202100308<br>NSCR202100310<br><br>Sobre: Art. 6A (3er Grado) Ley 154 (2008) Art. 6.14 Ley 168 (2019) Grave |

Panel integrado por su presidente, el Juez Rivera Colón, la Juez Lebrón Nieves y el Juez Rodríguez Flores.

Rivera Colón, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 15 de diciembre de 2023.

Comparece ante nos, el señor Salil A. Zaveri Flores (Sr. Zaveri Flores o apelante), quien presenta recurso de apelación en el que solicita la revocación de la "Sentencia Mixta" emitida el 14 de abril de 2023,[1] por el Tribunal de Primera Instancia, Sala Superior de Fajardo. Mediante dicho dictamen, el foro primario impuso al apelante una pena de tres (3) años y un (1) día, a ser cumplida bajo el régimen de restricción domiciliaria (en el caso NSCR202100308). A su vez, impuso una pena de un (1) año y un (1) día de cárcel, a cumplirse en la institución penal (en el caso NSCR202100310). Dispuso que ambas penas serían cumplidas de forma consecutiva, e impuso una multa por $3,000.00 (en el caso NSCR202100308), y el pago de una pena especial por la cantidad de $300.00 en ambos casos.

---

[1] Notificada el 19 de abril de 2023.

Número Identificador

SEN2023 _____

Además, el Sr. Zaveri Flores solicita que revisemos la determinación hecha por el foro primario el 14 de abril de 2023, mediante la cual declaró No Ha Lugar la solicitud de desestimación radicada por el apelante en corte abierta.

Examinada la solicitud de autos, la totalidad del expediente y el estado de derecho aplicable ante nuestra consideración, confirmamos el dictamen mediante los fundamentos que expondremos a continuación.

## I.

El 9 de mayo de 2021, se presentaron tres denuncias contra el Sr. Zaveri Flores. Se le imputó infringir las siguientes disposiciones penales: (1) el Art. 7 (a) de la Ley Núm. 154-2008, *infra*; (2) el Art. 6.14 de la Ley Núm. 168-2019, *infra*; y (3) el Art. 249 (c) del Código Penal.[2]  En esencia, se le imputó que, el 8 de mayo de 2021, disparó un arma de fuego en un lugar abierto al público, con la intención de ocasionarle la muerte a un perro.  En esa misma fecha, tras la celebración de una vista para la determinación de causa probable, al amparo de la Regla 6 de Procedimiento Criminal, 34 LPRA Ap. II, R. 6, el magistrado determinó causa probable para arresto por cada uno de los cargos.

El 19 de agosto de 2021,[3] se celebró Vista Preliminar, y el juez determinó que existía causa probable para creer que el apelante cometió los delitos imputados.  Tras la celebración del acto de lectura de acusación, el 10 de septiembre de 2021, el Sr. Zaveri Flores hizo alegación de no culpable.

Iniciado el juicio en su fondo, el Sr. Zaveri Flores presentó evidencia con el propósito de probar que actuó en legítima defensa. En apretada síntesis, la prueba testimonial presentada por la defensa intentó demostrar que el apelante actuó por terror, ya que

---

[2] 33 LPRA sec. 5339.
[3] Notificada el 20 de abril de 2023.

el perro lo estaba persiguiendo de forma agresiva. A su vez, se presentó prueba pericial para demostrar que este último posee un "stress postraumático" por experiencias vividas durante su niñez. Además de la prueba testifical, el Tribunal pudo evaluar prueba ilustrativa consistente en videos presentados como evidencia. Tras evaluar la totalidad de la prueba presentada, el Tribunal de Primera Instancia concluyó que, el Sr. Zaveri Flores no actuó por terror, sino por un sentimiento de molestia. Por ende, determinó que no se demostró la concurrencia de los elementos necesarios para la aplicación de la defensa afirmativa reclamada por el apelante, entiéndase, la legítima defensa.

Como consecuencia de lo anterior, el 14 de abril de 2023,[4] el foro *a quo* emitió una "Sentencia Mixta" mediante la cual impuso al Sr. Zaveri Flores una pena de tres (3) años y un (1) día, a ser cumplida bajo el régimen de restricción domiciliaria (en el caso NSCR202100308). A su vez, impuso una pena de un (1) año y un (1) día de cárcel, a cumplirse en la institución penal (en el caso NSCR202100310). Aclaró que, ambas penas serían cumplidas de forma consecutiva, e impuso una multa por $3,000.00 (en el caso NSCR202100308), y el pago de una pena especial por la cantidad de $300.00 en ambos casos.

Inconforme, el 3 de mayo de 2023, el Sr. Zaveri Flores recurre ante esta segunda instancia judicial, y plantea la comisión de los siguientes errores, a saber:

*Primer Error*

*Cometió error de derecho el Tribunal de Instancia al denegar la solicitud para la desestimación de la acusación por violación al artículo 6.14 de la Ley 168-2019 (Ley de Armas) fundada en que el pliego acusatorio no imputaba delito.*

*Segundo Error*

*Incidió el foro de instancia al encontrar culpable al apelante de haber incurrido en una violación al*

---

[4] Notificada el 19 de abril de 2023.

*artículo 6.14 de la Ley 168-2019 (Ley de Armas), a pesar de habérsele planteado que el texto de dicha disposición es vago, amplio y general ya que no informa adecuadamente la conducta prohibida lo que es contrario al principio de legalidad y, por ende, al debido proceso de ley.*

### Tercer Error

*El Ministerio Público no cumplió con el quántum de prueba constitucionalmente requerido ya que no estableció la culpabilidad del apelante más allá de duda razonable, no rebatió la presunción de inocencia ni estableció los elementos de los delitos imputados.*

### Cuarto Error

*Erró el Tribunal de Instancia al emitir fallo condenatorio, a pesar de que la prueba de cargo no debió merecer credibilidad alguna, por lo que el juzgador de hechos erró al darle peso y valor probatorio a dichos testimonios.*

### Quinto Error

*Incidió el TPI al dictar sentencia individual y separada por los cargos por el artículo 6.A de la Ley 154-2008 y el artículo 6.14 de la Ley 168-2019, aunque aplican las disposiciones del concurso de delitos.*

## II.

### -A-

La Constitución de Estados Unidos y la Constitución de Puerto Rico reconocen que ninguna persona será privada de su libertad o propiedad sin un debido proceso de ley. Véase, Art. II, Sec. 7 Const. ELA, LPRA, Tomo 1; Emda. V, Const. EE. UU., LPRA, Tomo 1. Por lo que, cuando el Estado atenta contra el interés libertario o propietario de una persona, deberá resguardar, entre otras garantías, una notificación adecuada del proceso. *Vázquez González v. Mun. de San Juan*, 178 DPR 636, 643 (2010). En virtud de lo anterior, el acusado, quien está propenso o expuesto a ser privado de su libertad, tiene derecho a ser notificado de la causa de acción en su contra, recibiendo copia de la acusación. Véase, Art. II, Sec. 11 Const. ELA, LPRA, Tomo 1; Emda. VI, Const. EE. UU., LPRA, Tomo 1.

Según la Regla 34 de Procedimiento Criminal, 34 LPRA Ap. II, R. 34, la acusación se define como "una alegación escrita hecha por un fiscal al Tribunal de Primera Instancia en la cual se imputa a una persona la comisión de un delito". Entre otras cosas, esta deberá contener:

> *Una exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común. Las palabras usadas en dicha exposición se interpretarán en su acepción usual en el lenguaje corriente, con excepción de aquellas palabras y frases definidas por ley o por la jurisprudencia, las cuales se interpretarán en su significado legal. Dicha exposición no tendrá que emplear estrictamente las palabras usadas en la ley, y podrá emplear otras que tuvieren el mismo significado. En ningún caso será necesario el expresar en la acusación o denuncia presunciones legales ni materias de conocimiento judicial.* Regla 35 (c) de Procedimiento Criminal, 34 LPRA Ap. II, R. 35 (c).

Como puede observarse, la precitada Regla exige que "la acusación exponga todos los hechos constitutivos del tipo delictivo, de forma que cualquier acusado de inteligencia mediana pueda, en efecto, entender de qué se le acusa". *Pueblo v. Pérez Feliciano*, 183 DPR 1003, 1011 (2011). Por esto, resulta indispensable que, al exponer las alegaciones contenidas en el pliego acusatorio, el Estado se asegure de describir adecuadamente el delito que se pretende imputar, incluyendo todos sus elementos. De lo contrario, el pliego acusatorio será insuficiente, y procederá su desestimación por no imputar delito alguno. Regla 64(a) de Procedimiento Criminal, 34 LPRA Ap. II, R. 64(a). De ser este el caso, el acusado podrá presentar una moción de desestimación en cualquier etapa del procedimiento, toda vez que ésta posee un carácter privilegiado. Regla 63 de Procedimiento Criminal, 34 LPRA Ap. II., R. 63.

En cambio, si el defecto en el pliego acusatorio no afecta los derechos sustanciales del acusado, estamos ante un defecto de forma. Regla 36 de Procedimiento Criminal, 34 LPRA Ap. II, R. 36.

Un defecto, imperfección u omisión de forma puede ser enmendado en cualquier momento, e incluso, "se entenderá subsanado [automáticamente] una vez rendido el veredicto del jurado o el fallo del tribunal". Regla 38 de Procedimiento Criminal, 34 LPRA Ap. II., R. 38.

Ahora bien, nuestro Alto Foro ha manifestado que "la acusación debe incluir todos los elementos del delito, de lo contrario será insuficiente y sufrirá de un defecto sustancial". *Pueblo v. Pérez Feliciano, supra,* a la pág. 1012. A diferencia de los defectos de forma, un defecto sustancial afecta los derechos sustanciales del acusado, ya sea porque le impide preparar adecuadamente su defensa, o porque tiene el efecto de insuficiencia del pliego acusatorio. *Íd.* Un defecto sustancial podrá ser subsanado en cualquier momento antes de la convicción o absolución del acusado. Regla 38 de Procedimiento Criminal, *supra.* No obstante, "el acusado tendrá derecho a que se le celebre de nuevo el acto de la lectura de la acusación". *Íd.*

Finalmente, la Regla 49 de Procedimiento Criminal, 34 LPRA Ap. II., R. 49, provee que, una acusación "no será insuficiente por razón de que no se nieguen en ellas las excepciones o excusas establecidas por ley, a menos que la excepción o excusa hubiere sido incorporada formando parte inseparable de la definición del delito".

**-B-**

En nuestro ordenamiento jurídico, es principio básico del debido proceso que, cuando un estatuto no es claro y preciso, éste adolece de nulidad por vaguedad. *In re Sueiro del Valle*, 194 DPR 510, 534 (2016). Nuestro Máximo Foro ha sido enfático en que la doctrina de vaguedad opera cuando: "(1) una persona de inteligencia promedio no queda debidamente advertida del acto u omisión que el estatuto pretende prohibir y penalizar; (2) se presta

a la aplicación arbitraria y discriminatoria, y (3) interfiere con el ejercicio de derechos fundamentales garantizados por la Constitución". *Pacheco Fraticelli v. Cintrón Antonsanti*, 122 DPR 229, 239-240 (1988).

En el contexto del derecho penal, resulta indispensable, por ejemplo, que el legislador, al tipificar cualquier delito, disponga una norma determinable de culpabilidad. Esto es, que una persona de ordinaria inteligencia tenga oportunidad razonable para conocer, sin tener que adivinar, la conducta prohibida y el sujeto a quien está dirigida. *Pueblo v. Mantilla*, 71 DPR 36, 40 (1950). De ahí, que el delito tiene que estar tipificado con todos sus elementos bien definidos, pues, como se trata de imponer responsabilidad penal, su lenguaje se evaluará con más rigurosidad que el de las leyes civiles. *Pueblo v. Diaz*, 160 DPR 1, 31 (2003). Así lo exigen los principios de legalidad y *nullum crimen sine lege. Íd.*, a la pág. 30.

Ahora bien, todas las leyes, por más claras que sean, pueden ser interpretadas judicialmente. *Pueblo v. APS Healthcare of P.R.*, 175 DPR 368, 378 (2009). Por esto, a través de nuestra labor interpretativa, estamos facultados para mitigar la vaguedad de determinado estatuto considerando sus términos y la intención legislativa, dentro de un ámbito permisible de interpretación que no requiera un análisis amplio para salvar su validez. *Pueblo v. Diaz, supra*, a las págs. 31-32.

**-C-**

Como regla general, un foro apelativo no debe intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que haya efectuado el juzgador de los hechos. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). Es decir, los tribunales apelativos deben mantener la deferencia para con la

apreciación de la prueba que realiza el Tribunal de Primera Instancia. *McConnell v. Palau,* 161 DPR 734 (2004).

El fundamento de esta deferencia hacia el Tribunal de Primera Instancia consiste en que el juez del foro primario tuvo la oportunidad de observar toda la prueba presentada y, por lo tanto, se encuentra en mejor posición que el tribunal apelativo para considerarla. *Sepúlveda v. Depto. de Salud,* 145 DPR 560, 573 (1998). El Tribunal Supremo de Puerto Rico ha resuelto que es el juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, ya que fue quien observó y escuchó a los testigos. *Argüello v. Argüello,* 155 DPR 62, 79 (2001). Esto es así, pues, como nos afirma el tratadista Cuevas Segarra, el juez sentenciador ante quien deponen los testigos es quien tiene la oportunidad de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su consciencia la convicción en cuanto a si dicen la verdad. J.A. Cuevas Segarra, <u>Tratado de Derecho Civil</u>. San Juan, Pubs. JTS, T. II, pág. 685 (2000).

Por ende, el tribunal revisor no intervendrá con la apreciación de la prueba hecha por el juzgador de los hechos, salvo que exista error manifiesto, pasión, prejuicio o parcialidad. *González Hernández v. González Hernández,* 181 DPR 746, 776-777 (2011). Lo anterior se fundamenta en que, de ordinario, "solo tenemos récords mudos e inexpresivos". *Muñiz Noriega v. Muñoz Bonet,* 177 DPR 967, 987 (2010). Sin embargo, nuestro Tribunal Supremo ha expresado que esta norma no es absoluta. *Méndez v. Morales,* 142 DPR 26, 36 (1996). Así, cuando el foro primario realice una apreciación errónea de la prueba, su determinación estará sujeta a la facultad revisora de los foros apelativos. *Cárdenas Maxán v. Rodríguez Rodríguez,* 125 DPR 702, 712 (1990).

De ese modo, los tribunales apelativos intervendrán cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de toda la evidencia recibida. *Méndez v. Morales, supra,* a la pág. 36.

**-D-**

En nuestro ordenamiento jurídico existen varias causas de exclusión de responsabilidad penal, entre ellas, la legítima defensa. Sobre este particular, el Art. 25 del Código Penal, 33 LPRA sec. 5038, dispone lo siguiente:

> *No incurre en responsabilidad penal quien defiende su persona, su morada, sus bienes o derechos, o la persona, morada, bienes o derechos de otros en circunstancias que hicieren creer razonablemente que se ha de sufrir un daño inminente, siempre que haya necesidad racional del medio empleado para impedir o repeler el daño, falta de provocación del que ejerce la defensa, y que no se inflija más daño que el necesario para repeler o evitar el daño.*

> *Cuando se alegue legítima defensa para justificar el dar muerte a un ser humano, es necesario creer razonablemente que al dar muerte al agresor, el agredido o la persona defendida se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal.*

Cuando el actor cause la muerte de un ser humano, y éste invoque legítima defensa en la morada, vehículo, lugar de negocios o empleo, el juzgador de los hechos presumirá que, al dar muerte al agresor, el actor se encontraba en inminente riesgo de muerte o grave daño corporal. Véase, Art. 25A (c) del Código Penal, 33 LPRA sec. 5038a. Lo anterior, siempre y cuando el actor demuestre que sabía o tenía razón para creer que la persona contra quien se usó la fuerza o violencia:

> *(i) penetró ilegalmente, o intentaba penetrar ilegalmente, al interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por el actor o la persona a quien el actor protege; y/o*

> *(ii) secuestró o intentó secuestrar; al actor o alguna otra persona, del interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por el actor o la persona a quien el actor protege. Íd.*

Por tanto, si el actor demuestra que causó la muerte de un ser humano según las disposiciones del precitado Art. 25A del Código Penal, *supra,* este "no incurrirá en responsabilidad penal o civil por los daños o muerte del agresor". Véase, Art. 25A (g) del Código Penal, *supra.*

Claro está, para justificar la defensa de la morada, vehículo, lugar de negocios o empleo, "las circunstancias indicarán una penetración ilegal o que la persona que se halle en la morada, vehículo, lugar de negocios o empleo, tenga la creencia razonable que se cometerá un delito". Art. 25 del Código Penal, *supra.* A su vez, debemos destacar que las presunciones dispuestas en el Art. 25A del Código Penal, *supra,* son controvertibles. Véase, Art. 25A (h) del Código Penal, *supra.* Por ejemplo, las presunciones establecidas en los incisos (a) y (c) no son de aplicación cuando, entre otras razones, el actor haya provocado a la persona a quien se causó la muerte. Véase, Art. 25A (d) del Código Penal, *supra.*

**-E-**

Es posible que una persona, mediante uno o varios actos, cometa dos o más delitos. Cuando ello acontece, es de aplicación la figura del concurso de delitos. Dicho principio tiene un propósito dual, a saber: (1) primero, evita que una persona sea castigada dos veces por un mismo hecho, y (2) segundo, modera la pena impuesta. *Pueblo v. Álvarez Vargas,* 173 DPR 587, 592 (2008). El concurso de delitos está reconocido en el Art. 71 del Código Penal de Puerto Rico, 33 LPRA sec. 5104, el cual dispone que:

> *(a) Concurso ideal y medial de delitos: Cuando sean aplicables a un hecho dos o más disposiciones penales, cada una de las cuales valore aspectos diferentes del hecho, o cuando uno de éstos es medio necesario para realizar el otro, se condenará por todos los delitos concurrentes, pero sólo se impondrá la pena del delito más grave.*
>
> *(b) Concurso real de delitos: Cuando alguien haya realizado varios delitos que sean juzgados simultáneamente, cada uno de los cuales conlleva su*

*propia pena, se le sentenciará a una pena agregada, que se determinará como sigue:*

*(1) Cuando uno de los delitos conlleve pena de reclusión de noventa y nueve (99) años, ésta absorberá las demás.*

*(2) Cuando más de uno de los delitos conlleve reclusión por noventa y nueve (99) años, se impondrá además una pena agregada del veinte (20) por ciento por cada víctima.*

*(3) En los demás casos, se impondrá una pena para cada delito y se sumarán, no pudiendo exceder la pena agregada del veinte (20) por ciento de la pena para el delito más grave.*

Como puede observarse, del precitado artículo surgen tres tipos de concurso: (1) ideal, (2) medial y (3) real. *Pueblo v. DiCristina Rexach,* 204 DPR 779, 790 (2020). El primero (concurso ideal), se configura cuando "un solo hecho o unidad de conducta infringe varios tipos delictivos que tutelan bienes jurídicos distintos". *Pueblo v. Álvarez Vargas, supra,* a la págs. 592-593. En estos casos, aunque se acusa al imputado por todos los delitos cometidos, solamente se sanciona con la pena del delito más grave. *Pueblo v. DiCristina Rexach, supra,* a la pág. 790. O sea, se impone la pena más alta entre todos los delitos cometidos.

El segundo (concurso medial), incluye aquellas instancias en las que el acusado comete más de un delito, pero uno de los delitos fue el medio necesario para cometer el otro. *Íd.* A diferencia del concurso ideal, existe una pluralidad de hechos. No obstante, aplican las normas del concurso ideal, entiéndase, se acusa al imputado por todos los delitos cometidos, pero solamente se sanciona con la pena del delito más grave. *Íd.*

Por último, el tercero (concurso real) contempla aquellas situaciones en las que un acusado, en actos distintos, infringe el mismo o varios delitos. En estos casos, existen varios actos y varios delitos. *Íd.,* a las págs. 790-791.

Para que proceda la aplicación del concurso de delitos, deben cumplirse los siguientes criterios: (1) la identidad de sujeto activo; (2) la comisión por ese sujeto de varios delitos independientes entre sí; (3) un juicio simultáneo según las Reglas de Procedimiento Criminal, y (4) que una disposición especial no prohíba la formación de la pena agregada. *Pueblo v. Álvarez Vargas, supra*, a la pág. 599. En cuanto al requisito de juicio simultáneo, basta con que se cumpla con la Regla 37(a) de Procedimiento Criminal, 34 LPRA Ap. II, respecto a la acumulación de delitos en un solo proceso judicial. *Pueblo v. Álvarez Vargas, supra*, a la pág. 600.

Por ende, las disposiciones relativas al concurso de delitos no serán de aplicación cuando exista una disposición especial que prohíba la formación de la pena agregada. *Pueblo v. DiCristina Rexach, supra, pág. 794*. En lo que nos atañe, el Art. 6.01 de la Ley Núm. 168-2019, 25 LPRA sec. 466, mejor conocida como la "Ley de Armas de Puerto Rico de 2020", según enmendada, expresamente dispone que "[t]odas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley".

**III.**

En el primer señalamiento de error, nos corresponde resolver si el pliego acusatorio presentado contra el Sr. Zaveri Flores por infracción al Art. 6.14 de la Ley Núm. 168-2019, *infra*, es defectuoso. En su escrito, el apelante alega que dicho pliego acusatorio no imputa delito alguno, toda vez que no se alega un elemento esencial del tipo delictivo: que el arma se utilizó en legítima defensa.

El Art. 6.14 de la Ley Núm. 168-2019, 25 LPRA sec. 466m, tipifica la siguiente conducta:

> *Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, **toda persona que**, **salvo en casos de legítima defensa, propia o de terceros**,*

*o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:*

*(a) voluntariamente dispare cualquier arma de fuego fuera de los lugares autorizados por esta Ley, aunque no le cause daño a persona alguna; o*

*(b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna.*

[...] (Énfasis nuestro).

El precitado artículo tipifica dos (2) conductas distintas. La primera, disparar un arma de fuego. La segunda, apuntar el arma de fuego. Obviamente, para que se configure el delito no basta con que se cumpla el acto de apuntar o disparar, sino que, también es necesario que concurra el elemento subjetivo y las demás circunstancias para ello. Por ejemplo, los elementos de la primera modalidad de este delito, según tipificado en el inciso (a), son los siguientes: (1) disparar un arma de fuego, (2) voluntariamente, (3) fuera de los lugares autorizados por la Ley de Armas, *supra.*

Por tanto, es necesario que, para cumplir con la Regla 35 (c) de Procedimiento Criminal, *supra,* la acusación exponga cada uno de los hechos antes enumerados. En el caso de autos, el pliego acusatorio presentado contra el Sr. Zaveri Flores por infracción al Art. 6.14 de la Ley Núm. 168-2019, *supra,* lee de la siguiente forma:

*El referido acusado Salil A. Zaveri, allá en o para el día 8 de mayo de 2021 y en Río Grande; Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Fajardo, ilegal, **voluntaria** y criminalmente, a propósito y con conocimiento, en tres ocasiones **disparó un arma de fuego**, marca Glock, modelo 26, calibre 9mm, color negra, **fuera de los lugares autorizados por ley**, **en el campo de golf del hotel Wyndham Rio Mar, de Rio Grande**.*

(Énfasis suplido).

Como puede apreciarse, en el pliego acusatorio se alegó que el apelante: (1) disparó un arma de fuego, (2) voluntariamente, (3) fuera de los lugares autorizados por la Ley de Armas, o sea, en el

campo de golf del hotel Wyndham Rio Mar, de Rio Grande. Por ende, **concluimos que el Estado cumplió con exponer todos los hechos constitutivos del tipo delictivo**. **Así**, **no existe un defecto sustancial en el pliego acusatorio que haya afectado los derechos sustanciales del Sr. Zaveri Flores**.

Queremos aclarar que, contrario a la postura del apelante, **la legítima defensa**, **propia o de terceros**, **no es un elemento del tipo delictivo**, **sino una excepción al mismo**. De una lectura al Art. 6.14 de la Ley Núm. 168-2019, *supra*, surge que, comete delito toda persona que incurra en las conductas descritas en los incisos (a) y (b), **salvo** que, entre otros casos, lo haya hecho en legítima defensa, propia o de terceros. **La Regla 49 de Procedimiento Criminal**, *supra*, **dispone que**, **una acusación no será insuficiente por razón de que no se nieguen en ellas las excepciones o excusas establecidas por ley**, salvo que dicha excepción sea parte inseparable de la definición del delito. **En este caso**, **la legítima defensa no es parte inseparable de la definición contenida en el inciso** (a) **del Art. 6.14 de la Ley Núm. 168-2019**, *supra*. **Por tanto**, **el Estado no estaba obligado a negar que el Sr. Zaveri Flores actuó en legítima defensa**. Por entender que el pliego acusatorio cumple con los criterios de suficiencia a la luz de nuestro ordenamiento legal, el primer error no fue cometido.

En su segundo señalamiento de error, el apelante alega que, el Art. 7 (a) de la Ley Núm. 154-2008, 5 LPRA sec. 1670, conocida como "Ley para el Bienestar y la Protección de los Animales", según enmendada, está redactado de forma amplia, vaga y general porque no informa adecuadamente la conducta prohibida.

Su contención es que, la Ley Núm. 154-2008, *supra*, define los conceptos de "animal" y "animal realengo", distinguiendo así entre uno y otro. Sostiene que, el Art. 7 (a) de la Ley Núm. 154-

2008, *supra*, tipifica el maltrato de un "animal", por lo que, como el delito no incluye expresamente el concepto de "animal realengo", el tribunal actuó "en contra de la intención legislativa [al] crear por analogía un delito inexistente". En palabras sencillas, aduce que el Art. 7 (a) de la Ley Núm. 154-2008, *supra*, no castiga el maltrato de un "animal realengo".

Reiteradamente, nuestro Máximo Foro ha enunciado que:

> *... [Es] principio cardinal de hermenéutica que '[a]l interpretar una disposición específica de una ley, los tribunales deben siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarla y nuestra determinación debe atribuirle un sentido que asegure el resultado que originalmente se quiso obtener' ... Nuestra obligación fundamental en estos casos, es imprimirle efectividad a la intención legislativa, propiciando de esta forma la realización del propósito que persigue la ley... Al interpretar y aplicar un estatuto hay que hacerlo teniendo presente el propósito social que lo inspiró... Pizarro v. Nicot*, 151 DPR 944, 951 (2000), citando a *Vázquez v. A.R.P.E.*, 128 DPR 513, 523 (1991).

Según se desprende de la Exposición de Motivos de la Ley Núm. 154-2008, *supra*, los animales son seres vivientes dignos de un trato justo y humanitario, incluyendo respeto, atención, cuidado y protección por parte del ser humano. Por esta razón, se reconoce la "vital importancia [de] proteger y cuidar de los animales" mediante la creación de un estatuto abarcador que permita "disuadir y/o procesar a las personas del abuso contra los animales". *Íd.* Queda claro que el propósito del estatuto no es otro que el de tomar "medidas para evitar que se continúe con el maltrato de animales... no sólo para la protección de estos seres indefensos, sino para colaborar a desarrollar una sociedad puertorriqueña mentalmente saludable". *Íd.*

Con esta intención legislativa en mente, procedemos a analizar las distintas disposiciones de la Ley Núm. 154-2008, *supra*. En primer lugar, procedemos a analizar las definiciones contenidas en el Art. 2 de la Ley Núm. 154-2008, 5 LPRA sec.

1660. El antedicho artículo define el término "animal" como "**cualquier animal mamífero**, aves, reptiles, anfibios, peces, cetáceos y cualquier otro animal de los tipos *(phyla)* superiores o que esté en cautiverio o bajo el control de cualquier persona, o cualquier animal protegido por leyes federales o estatales u ordenanzas municipales". (Énfasis provisto).

Como el texto legislativo no ofrece una definición intrínseca del término "mamífero", podemos definir el concepto por medio de un diccionario. R.E. Bernier y J.A Cuevas Segarra, <u>Aprobación e Interpretación de las Leyes en Puerto Rico</u>, 2da ed., San Juan, Pubs. JTS, pág. 250, 1987. La palabra "mamífero" incluye aquellos animales vertebrados cuyo embrión "se desarrolla casi siempre dentro del seno materno, y cuyas crías son alimentadas por las hembras con la leche de sus mamas". <u>Diccionario de la Lengua Española</u>, Real Academia Española, 22ed., Madrid, Ed. Espasa Calpe, 2001, T.II. A su vez, la Real Academia Española define la palabra "perro" como un "[**m**]**amífero doméstico** de la familia de los cánidos, de tamaño, forma y pelaje muy diversos, según las razas, que tiene olfato muy fino y es inteligente y muy leal a su dueño. *Íd.* (Énfasis nuestro).

A su vez, el Art. 2 de la Ley Núm. 154-2008, *supra,* define el concepto de "animal realengo" como "aquél que no tenga guardián conocido". *Íd.* Asimismo, el aludido artículo "maltrato" incluye "a todo acto u omisión en el que incurre una persona, **sea guardián o no**, que ocasione o ponga a un **animal** en riesgo de sufrir daño a su salud e integridad física y/o emocional". (Énfasis nuestro).

Expresándose sobre la interpretación de los estatutos penales, en *Pueblo v. Negrón Nazario,* 191 DPR 720, 739 (2014), nuestro Máximo Foro expresó que:

> *[T]odas las leyes, incluyendo las de índole penal, están sujetas a interpretación. Conforme a ello, ante una duda de qué es lo que constituye delito bajo*

*determinada disposición penal, el tribunal debe aplicar los correspondientes principios de hermenéutica, lo cual podría resultar en alcanzar una interpretación restrictiva o extensiva del delito.*

Acorde lo anterior, el principio de legalidad estatuido en el Art. 2 del Código Penal de Puerto Rico, 33 LPRA sec. 5002, no nos impide ejercer nuestra función interpretativa cuando se trata de leyes penales.[5] De hecho, así lo reconoce nuestro Código Penal al indicar que "[l]as palabras y frases se interpretarán según el contexto y el significado sancionado por el uso común y corriente". Véase, Art. 12 del Código Penal de Puerto Rico, 33 LPRA sec. 5012. Esto implica que, al analizar una ley penal:

> *En primer lugar, el principio de legalidad no obliga al tribunal que va a interpretar a adoptar "una interpretación restrictiva cuando inicialmente surge una duda sobre que dispone el delito". En segundo lugar, y sin rayar en la analogía, el Tribunal puede optar por una interpretación extensiva del delito, "siempre y cuando la misma no sobrepase el sentido literal posible del estatuto penal".* Cosme Morales, J., <u>Los Seres Sensibles y el Principio de Legalidad</u>, Revista de Derecho Puertorriqueño, 60:2, Pág. 728, (2021). (Citas Omitidas).

Dicho esto, procedemos a interpretar el delito de maltrato agravado de animales, según definido en el Art. 7 (a) de la Ley Núm. 154-2008, 5 LPRA sec. 1670, el cual dispone que:

> *a. Una persona comete el delito de maltrato agravado de animales si la persona intencionalmente o a sabiendas:*
>
> > *i. Tortura un animal; o*
> >
> > *ii. **Mata a un animal** bajo circunstancias que demuestren malicia premeditada o un grave menosprecio por la vida.*
>
> (Énfasis suplido).

Este delito posee dos modalidades: (1) tortura o (2) muerte. En cuanto a la segunda, los elementos del tipo delictivo son los siguientes: (1) una persona, (2) intencionalmente o a sabiendas, (3)

---

[5] El principio de legalidad prohíbe cualquier acción penal contra una persona por la comisión de cualquier hecho que no esté expresamente definido como delito. También prohíbe la creación de delitos por analogía.

mata un animal, (4) bajo circunstancias que demuestren malicia premeditada o grave menosprecio por la vida.

Como puede apreciarse, al definir el delito, el legislador utilizó la palabra "animal", y dejó de incluir el término de "animal realengo". El Sr. Zaveri Flores asevera que, como el delito no incluye la muerte de un "animal realengo", se le aplicó por analogía. Su argumento no tiene méritos.

Según adelantamos, la clara intención legislativa detrás de la aprobación de la Ley Núm. 154-2008, *supra,* es clara: respetar, proteger y cuidar **a todos** los animales. Por su parte, el término "animal", según definido en el Art. 2 de la Ley Núm. 154-2008, *supra,* incluye, entre otros, a **cualquier animal mamífero**. Un perro, según la Real Academia Española, es un **animal mamífero**.

Primero, queremos dejar claro que, a nuestro juicio, **la intención del legislador es la de defender a todos los animales**, **sin importar si éstos poseen o no algún guardián conocido**. Por lo que, para efectos de la comisión del delito de maltrato agravado, el describirlo o añadirle el adjetivo de "realengo" no hace diferencia alguna. No obstante, aún asumiendo que éstos quedasen excluidos, el apelante incurrió en la conducta tipificada, pues, como ya mencionamos, **un perro es un "animal" para los efectos de la Ley Núm. 154-2008**, *supra*.[6] Por ende, no podemos adoptar la postura del apelante, respecto a que éste no fue advertido adecuadamente sobre el acto u omisión que el Art. 7 (a) de la Ley Núm. 154-2008, *supra*, pretende prohibir. La prohibición es fácilmente discernible, y no deja al arbitrio irrestricto de las autoridades la determinación de los elementos de la ofensa. Por ello, el segundo error tampoco fue cometido.

---

[6] De hecho, el Art. 3 (d) de la Ley Núm. 154-2008, 5 LPRA sec. 1666, hace alusión expresa a los perros.

En su tercer y cuarto señalamiento de error, el Sr. Zaveri Flores cuestiona la credibilidad otorgada por el foro *a quo* en su evaluación de la prueba testifical. Por estar íntimamente relacionados, discutiremos ambos errores en conjunto.

La posición del apelante es que la prueba desfilada demostró que actuó en legítima defensa "de un compañero de golf y luego en la suya propia".[7] En ese contexto, aduce que demostró los elementos necesarios para que opere la mencionada defensa afirmativa, ya que: (1) tenía la creencia de que iba a sufrir un daño inminente, (2) hubo ausencia de provocación por su parte, (3) existía necesidad racional para emplear el arma de fuego, (4) no infligió más daño que el necesario para repeler o evitar el daño, y (5) tenía motivos fundados para creer que se encontraba en peligro de muerte o grave daño corporal. Además, alude a que el Estado no logró rebatir la presunción establecida en el Art. 25A del Código Penal, *supra.*

En cambio, el Ministerio Público apuesta a que la presunción del Art. 25A del Código Penal, *supra*, es inaplicable al caso. A su vez, niega la concurrencia de los elementos necesarios para que opere la defensa afirmativa invocada por el apelante.

Primero, atenderemos lo relativo a la aplicación de la presunción. Debemos comenzar nuestro análisis mencionando que "[l]as presunciones son aquéllas establecidas por ley o por decisiones judiciales". Regla 304 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 304. Una presunción es aquella "deducción de un hecho que la ley autoriza a hacer o requiere que se haga de otro hecho o grupo de hechos previamente establecidos en la acción". Regla 301 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 301. "El hecho base es ese elemento fáctico establecido previamente, y

---

[7] Véase, apéndice pág. 19.

el hecho deducido mediante la presunción, se le denomina hecho presumido". *Íd.*

En palabras literales, el Art. 25A del Código Penal, *supra*, provee lo siguiente:

> *(a) Se presumirá la razonabilidad de la creencia del actor de que él, u otra persona, está en riesgo de sufrir daño inminente a su integridad corporal, la ausencia de provocación por parte del actor y la necesidad racional del medio empleado y del daño ocasionado para impedir o repeler el daño, si:*
>
>> *(1) el actor sabía o tenía razón para creer que la persona contra quien se usó la fuerza o violencia:*
>>
>>> *(i) penetró ilegalmente, o intentaba penetrar ilegalmente, al interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por el actor o la persona a quien el actor protege; y/o*
>
> [...]
>
> *(b) La presunción establecida en el inciso (a) no es de aplicación, si:*
>
> [...]
>
>> *(3) hubo provocación por parte del actor para con la persona contra quien se usó la fuerza o violencia; o*
>
> [...]
>
> *(c) Al causarse la muerte de un ser humano, se presumirá la razonabilidad de la creencia del actor para creer que, al dar muerte al agresor, el actor o la persona defendida se hallaba en inminente o inmediato peligro de muerte o de grave daño corporal si:*
>
>> *(1) el actor sabía o tenía razón para creer que la persona a quien se causó la muerte:*
>>
>>> *(i) penetró ilegalmente, o intentaba penetrar ilegalmente, al interior de la morada, vehículo, lugar de negocios o empleo, ocupado en tal momento por el actor o la persona a quien el actor protege; y/o*
>
> [...]
>
> *(d) La presunción establecida en el inciso (c) no es de aplicación si:*
>
> [...]
>
>> *(3) hubo provocación por parte del actor a la persona a quien se causó la muerte; o*

Como puede observarse, la precitada disposición aplica en favor del **actor** que utiliza fuerza o violencia o causa la muerte de un **ser humano** o de una **persona** para, entre otras cosas, defender su vehículo. Así surge del propio Art. 14 del Código

Penal, 33 LPRA sec. 5014, el cual define el término de "actor" como "aquella persona que, en defensa de su morada, vehículo, negocio o lugar de trabajo o en defensa de la morada, vehículo, negocio o lugar de trabajo de otra persona, **causa daño o la muerte a un <u>ser humano</u>**". (Énfasis suplido). A su vez, el antedicho artículo aclara que el concepto de "persona" se refiere a "las **personas naturales** y las personas jurídicas". *Íd.* (Énfasis provisto). Incluso, el propio Art. 2 de la Ley Núm. 154-2008, *supra*, distingue los conceptos de "animal" y "persona", definiendo este último como cualquier "**individuo**, corporación, fideicomiso, asociación, sociedad o cualquier otra entidad legal, **natural** o jurídica". Aunque nuestro Código Penal ni la Ley Núm. 154-2008, *supra*, definen propiamente el término de "ser humano", no albergamos duda de que éste se utiliza para sustituir el concepto de persona natural.

De conformidad con el análisis de interpretación gramatical que antecede, **no podemos asumir el hecho presumido de que las actuaciones del Sr. Zaveri Flores fueron razonables**, **toda vez que el apelante no logró demostrar el hecho base**: **que**, **con el propósito de defender su vehículo**, **utilizó fuerza o violencia o causó la muerte de un <u>ser humano</u> o de una <u>persona</u>**. **Aquí, la víctima es un <u>animal</u> que**, **aunque siente y padece**, **no puede considerarse una <u>persona o ser humano</u>**.[8] Por ende, concluimos que la presunción del Art. 25A del Código Penal, *supra*, es inaplicable al caso.

Aclarado este asunto, procedemos entonces a determinar si concurren los elementos necesarios para una legítima defensa. El juicio fue celebrado por tribunal de derecho los días 30 y 31 de enero, y 1, 2, 6, 8, 10, 13 y 16 de febrero de 2023. A continuación,

---

[8] El Art. 67 de nuestro Código Civil, 31 LPRA 5501, dispone que hay dos tipos de persona: (1) natural y (2) jurídica. Asimismo, preceptúa que "[**t**]**odo ser humano es persona natural**". (Énfasis nuestro).

resumimos los aspectos relevantes de los testimonios pertinentes a la defensa afirmativa en la que se ampara el apelante:

**Pedro Javier Nevárez Bruno**: Declaró que, el 8 de mayo de 2021, estaba en Western Rio Mar participando en un juego de golf junto con un grupo de amigos.[9] Relató que la partida se componía de 18 hoyos y que, aproximándose al hoyo 17, pudo observar tres perros pequeños jugando entre ellos.[10] Una vez finalizado el hoyo 17, pasó entonces al hoyo 18 y escuchó una detonación.[11] Acto seguido, observa a un caballero en el *green* del hoyo 17 ejecutando un segundo tiro.[12] En ese momento, se percata de que el ruido proviene de ese lugar, y que es ocasionado por un arma de fuego.[13] Posteriormente, visualiza al caballero acercarse un poco más a lo que le estaba disparando, y hace un tercer tiro.[14] Manifestó que, aunque escuchó tres tiros, solo pudo observar dos de ellos.[15] Expresó que, luego de realizado el tercer tiro, el caballero colocó su arma de fuego en el carrito de golf, cogió su palo de golf y terminó su partida como si nada pasara.[16] Indicó que fue hasta el lugar y observó al perro muerto.[17] Aunque había visto los perros muchas veces,[18] estos nunca le atacaron.[19] Comentó que, nunca los consideró como una amenaza,[20] y que los había visto jugando y cazando iguanas.[21]

**Tory Green**: Expresó que, el 8 de mayo de 2021, estaba jugando golf con el apelante, Wissan Mouneyard y Robert Philipps.[22] Una vez llegan al hoyo 17, pegó un segundo tiro al

---

[9] TP de 30 de enero de 2023, pág. 92 líneas 24 y 25; pág. 93 líneas 1-5.
[10] *Íd.*, pág. 94 líneas 8-25.
[11] *Íd.*, pág. 95 líneas 8-9; 19-23.
[12] *Íd.*, pág. 97 líneas 6-22.
[13] *Íd.*
[14] *Íd.*
[15] *Íd.*, pág. 99 líneas 22-25; pág. 145 líneas 1-13.
[16] *Íd.*, pág. 102 líneas 11-13; pág. 111 líneas 21-25; pág. 112 líneas 1-7.
[17] *Íd.*, pág. 103 líneas 12-15 y 23-25; pág. 104 líneas 1-3.
[18] *Íd.*, pág. 115 líneas 1-3.
[19] *Íd.*, pág. 117 líneas 9-11.
[20] *Íd.*, pág. 117 líneas 10-25.
[21] *Íd.*, pág. 118 líneas 8-12.
[22] TP de 1 de febrero de 2023, pág. 27 líneas 2-24.

*green*,[23] y un perro cogió su bola y comenzó a correr hacia el *fairway*.[24] Allí permaneció sentado junto a otros dos perros,[25] y después soltó la bola y comenzó a correr en dirección distinta a la que ellos se encontraban.[26] Habiendo el perro soltado la bola, fue hasta allá y la recogió.[27] Mientras manejaba su carrito de golf hasta el *green*, el perro comenzó a perseguirlo.[28] Posteriormente, dejó de seguirlo.[29] Continuó su marcha por la parte posterior del *green*, una montaña alta que le impedía visibilidad hacia el otro lado.[30] Es entonces cuando escucha dos disparos provenientes del otro lado del *green*.[31] Hasta ese momento, desconocía que el apelante estaba armado.[32] Quería ver lo que estaba sucediendo, por lo que caminó desde la parte posterior del *green* y pudo observar al apelante con el arma de fuego.[33] Además, visualizó cuando disparó al perro por tercera ocasión.[34] Expresó que la muerte del perro le causó molestia,[35] y que no quiso seguir jugando.[36] Sus compañeros continuaron jugando el hoyo 18 hasta que llegó la policía.[37]

En el contrainterrogatorio, dijo que no escuchó al apelante decir "vamos a brincar *(skip)* el hoyo 17".[38] Tampoco observó al perro perseguir al apelante.[39] Es más, no visualizó ninguna interacción entre el apelante y el perro, a parte del tercer disparo.[40] Admitió que el tercer tiro le pareció fue uno de misericordia porque el perro estaba sufriendo.[41] Declaró que, a pesar de que el perro lo

---

[23] *Íd.*, pág. 30 líneas 5-21.
[24] *Íd.*, pág. 33 líneas 3-17.
[25] *Íd.*, pág. 33 líneas 19-22.
[26] *Íd.*, pág. 35 líneas 9-25; pág. 38 líneas 2-8.
[27] *Íd.*, pág. 38 líneas 12-20.
[28] *Íd.*, pág. 38 líneas 22-25; pág. 39 líneas 1-12; pág. 82 líneas 4-10.
[29] *Íd.*, pág. 39 líneas 16-23; pág. 82 líneas 4-10.
[30] *Íd.*, pág. 40 líneas 2-9; pág. 82 líneas 19-22.
[31] *Íd.*, pág. 40 líneas 11-24; pág. 41 líneas 2-13.
[32] *Íd.*, pág. 42 líneas 13-25.
[33] *Íd.*, pág. 43 líneas 15-24.
[34] *Íd.*, pág. 44 líneas 3-8.
[35] *Íd.*, pág. 47 líneas 10-12 y 20-22; pág. 53 líneas 2-6.
[36] *Íd.*, pág. 47 líneas 13-16.
[37] *Íd.*, pág. 58 líneas 7-17.
[38] *Íd.*, pág. 79 líneas 12-19.
[39] *Íd.*, pág. 83 líneas 9-21.
[40] *Íd.*, pág. 116 líneas 1-11.
[41] *Íd.*, pág. 101 líneas 1-19.

persiguió, no sabía si estaba atacando o jugando.[42]   Finalmente, expresó que, previo al día de los hechos, había visto a los perros alrededor del parque de golf, que las personas comentaban sobre el tema, y que todos sabían que había perros en el área.[43]

**Wissan Mouneyard**: Testificó que, el 8 de mayo de 2021, se encontraba en Western Rio Mar jugando golf con el apelante.[44] Dijo que, al llegar al hoyo 17, observó los perros.[45]  Los veía todo el tiempo, y en esta ocasión, estaban sentados en el *fairway*.[46] Relató que su compañero, Tory Green, golpeó su pelota y, posteriormente, uno de los perros la cogió y comenzó a jugar con ella.[47]  Declaró que Tory Green fue a buscar la bola en su carro de golf, pero tuvo que regresar luego de que uno de los perros comenzara a seguirlo.[48]  Después, el apelante intentó buscar la bola en su carro de golf, pero, como el perro también lo siguió, este regresó y se estacionó a su lado.[49]  En ese momento, se percató de que el apelante tenía un arma de fuego y comenzó a hacer bromas al respecto.[50] Le dijo: "¿qué vas a hacer? ¿vas a dispararle a los perros?", y comenzó a reírse.[51] Aunque el apelante sugirió obviar *(skip)* el hoyo 17, éste se fue, por segunda ocasión, a buscar la bola.[52]  Según observó, de los tres perros, dos de ellos permanecieron sentados, y solo uno comenzó a seguirlo.[53]  Al ver lo que sucedía, comenzó a reírse y no pensó que era peligroso.[54] Mientras tanto, el apelante intentó evadir el perro, pero le disparó.[55]   Al ejecutar la primera detonación, el perro se encontraba a una distancia aproximada de seis (6) pies del

---

[42] *Íd.*, pág. 104 líneas 2-10.
[43] *Íd.*, pág. 125 líneas 12-25; pág. 126 líneas 1-12; pág. 128 líneas 1-14.
[44] TP de 31 de enero de 2023, pág. 24 líneas 6-25.
[45] *Íd.*, pág. 26 líneas 17-25.
[46] *Íd.*, pág. 28 líneas 4-16; pág. 33 líneas 19-24.
[47] *Íd.*, pág. 34 líneas 3-16.
[48] *Íd.*, pág. 35 líneas 2-14.
[49] *Íd.*, pág. 36 líneas 16-25.
[50] *Íd.*, pág. 38 líneas 16-24.
[51] *Íd.*, pág. 41 líneas 2-11; pág. 42 líneas 18-25.
[52] *Íd.*, pág. 41 líneas 2-11; pág. 44 líneas 13-25; pág. 45 1-16.
[53] *Íd.*, pág. 46 líneas 1-15.
[54] *Íd.*, pág. 83 líneas 11-24.
[55] *Íd.*, pág. 46 líneas 1-15.

apelante.[56]  Acto seguido, el apelante detiene su carro de golf, se baja, y hace un segundo disparo.[57]  Indicó que, luego de lo acontecido, el apelante continuó jugando y golpeó su pelota.[58]  Asombrado por lo ocurrido, fue donde el apelante y le dijo "pero qué hiciste, no era necesario".[59]  El apelante le contestó: "¿qué querías que hiciera? Podía tener rabia".[60]  Como el perro continuaba moviéndose, el apelante le disparó en una tercera ocasión.[61]  Continuaron su juego hasta que llegó la policía.[62]

A preguntas de la defensa, declaró que, a su entender, el apelante no tenía la intención de matar el perro.[63]  Igualmente señaló que el apelante estaba triste después de matar el animal.[64]  Sin embargo, reiteró que continuaron jugando.[65]  Asimismo, sostuvo que el perro, mientras perseguía al apelante, estaba ladrando.[66]  Además, aseveró que creía que el tercer tiro fue uno de misericordia.[67]  También, admitió conocer que el apelante tenía miedo a los perros realengos.[68]  Reconoció que, aunque el apelante le pidió saltar u obviar el hoyo 17,[69] se negó a hacerlo porque veía los perros todo el tiempo y no les tenía miedo.[70]  En cuanto al carácter, expresó que el apelante no le parecía una persona violenta, sino amable.[71]  No obstante, aclaró que su opinión se basa en las cuatro o cinco veces que compartió con él en el campo de golf.[72]  Finalmente, hizo constar que, en una ocasión el apelante le comentó que había dejado su arma de fuego en la bolsa de golf, por lo que le preguntó: "para qué necesitas el arma de fuego en un

---

[56] *Íd.*, pág. 49 líneas 9-16.
[57] *Íd.*, pág. 46 líneas 1-15; pág. 49 líneas 17-25.
[58] *Íd.*, pág. 52 líneas 24 y 25; pág. 53 líneas 1-24.
[59] *Íd.*, pág. 55 líneas 6-20.
[60] *Íd.*
[61] *Íd.*, pág. 58 líneas 9-24.
[62] *Íd.*, pág. 92 líneas 9-25; pág. 93 líneas 1-4.
[63] TP de 2 de febrero de 2023, pág. 86 líneas 6-15.
[64] *Íd.*, pág. 86 líneas 16-23.
[65] *Íd.*, pág. 172 líneas 15-25; pág. 173 líneas 1-6.
[66] *Íd.*, pág. 87 líneas 3-10.
[67] *Íd.*, pág. 88 líneas 3-10.
[68] *Íd.*, pág. 99 líneas 12-22.
[69] *Íd.*, pág. 122 líneas 6-12.
[70] *Íd.*, pág. 123 líneas 2-10.
[71] *Íd.*, pág. 133 línea 25; pág. 134 líneas 1-4; pág. 161 líneas 15-23.
[72] *Íd.*, pág. 166 líneas 7-17.

campo de golf", a lo que el apelante le contestó: "Uno nunca sabe, hay perros que pueden tener rabia".[73]

**Robert Philipps**: Durante el juicio, se admitió en evidencia una declaración jurada que prestó el testigo.[74] Este relató que pudo observar cuando Tory Green fue a recoger su bola, pero el perro se lo impidió.[75] Aunque reconoció que estaba enfocado en su bola de golf y mirando el piso al momento en que se hicieron los primeros dos disparos,[76] aclaró que el apelante dijo que el perro lo atacó y que no tenía razón para no creerle.[77] Especificó que el día de los hechos los perros estaban más agresivos.[78]

**Salil Ashok Zaveri**: Testificó que, al llegar al hoyo 17, cada cual estaba manejando su propio carro de golf,[79] y que no podía ver el *fairway* ni los perros.[80] Después que hicieron su primer tiro,[81] fueron donde las bolas habían caído y, en ese instante, pudo observar a los perros.[82] Antes de hacer su segundo tiro, estaba analizando si quería o no jugar el hoyo 17, pues había tres perros directamente frente a ellos.[83] Mientras tanto, Tory Green le pegó a su bola, y uno de los perros comenzó a jugar con ella.[84] Eso le pareció bonito *(cute)*, y pensó que el perro era juguetón *(playful).*[85] Al verlo jugar, su nivel de tensión bajó.[86] Esto, a pesar de que normalmente piensa que los perros realengos son peligrosos, especialmente si andan en jauría.[87] Declaró que los otros dos perros permanecieron sentados en el medio del *fairway* cogiendo sol.[88] Ello provocó que su nivel de tensión bajara aún más.[89] Por

---

[73] *Íd.*, pág. 190 líneas 19-25; pág. 191 líneas 1-11.
[74] Esta declaración jurada fue estipulada por las partes.
[75] *Íd.*, pág. 241 líneas 15-19.
[76] *Íd.*, pág. 241 líneas 24 y 25; pág. 242 líneas 1-4.
[77] *Íd.*, pág. 242 líneas 6-9.
[78] *Íd.*, pág. 242 líneas 10 y 11.
[79] TP de 9 de febrero de 2023, pág. 31 líneas 4-25.
[80] *Íd.*, pág. 32 líneas 3-10.
[81] *Íd.*, pág. 33 líneas 13-16.
[82] *Íd.*, pág. 34 líneas 5-9.
[83] *Íd.*, pág. 35 líneas 1-11.
[84] *Íd.*, pág. 35 líneas 12-25.
[85] *Íd.*, pág. 36 líneas 1-3.
[86] *Íd.*, pág. 36 líneas 17-21.
[87] *Íd.*, pág. 36 líneas 6-16.
[88] *Íd.*, pág. 36 líneas 22-25.

consiguiente, continuó jugando y le pegó a su bola por segunda ocasión.[90] Luego, continuó moviéndose adelante, y ahí fue cuando uno de los perros comenzó a seguirlo.[91] Los otros dos perros permanecieron sentados.[92] Como el perro estaba distante, logró esquivarlo.[93] Ante lo sucedido, sintió terror, y tenía el arma en su mano porque estaba bajo ataque.[94] Regresó donde estaba, se estacionó al lado de Wissan Mouneyard, y le dijo "vamos a brincar *(skip)* el hoyo".[95] Ya no quería seguir jugando.[96] Sin embargo, pudo apreciar que uno de los perros comenzó a perseguir a Tory Green, y pensó que también lo estaban atacando.[97] En ese momento, sintió que era necesario defender a Tory Green.[98] Se montó en su carro de golf,[99] empezó a conducir hacia su compañero,[100] y comenzó a gritar "hey hey hey" para evitar que el perro continuara persiguiéndolo.[101] Cuando el perro lo escuchó, se giró y comenzó a correr a donde él.[102] Testificó que el perro estaba saltando hacia él para entrar al carro de golf, por lo que le disparó en el pecho para detenerlo.[103] Todo sucedió en fracción de segundos, por lo que tuvo que tomar la decisión de disparar.[104] Pensó que los perros estaban actuando en conjunto para causarle daño corporal o la muerte.[105] Luego del disparo, los otros dos perros se fueron huyendo,[106] y el perro herido estaba en el suelo temblando rigorosamente.[107] Sintió pena por él, y se bajó a

---

[89] *Íd.*, pág. 37 líneas 2-6; pág. 46 líneas 1-24.
[90] *Íd.*, pág. 37 líneas 7-20.
[91] *Íd.*, pág. 47 líneas 1-17.
[92] *Íd.*, pág. 52 líneas 4-18.
[93] *Íd.*, pág. 56 líneas 4-16.
[94] *Íd.*, pág. 59 líneas 1-15.
[95] *Íd.*, pág. 58 líneas 16-21.
[96] *Íd.*, pág. 60 líneas 1-8.
[97] *Íd.*, pág. 66 líneas 17-25; pág. 67 líneas 2-11.
[98] *Íd.*, pág. 69 líneas 22-25; pág. 70 líneas 1-4.
[99] *Íd.*, pág. 70 línea 8.
[100] *Íd.*, pág. 72 líneas 19-21.
[101] *Íd.*, pág. 72 líneas 22-25; pág. 73 líneas 1-4.
[102] *Íd.*, pág. 74 líneas 16-25.
[103] *Íd.*, pág. 81 líneas 2-21.
[104] *Íd.*, pág. 82 líneas 4-20.
[105] *Íd.*, pág. 77 líneas 2-17; pág. 83 líneas 1-9.
[106] *Íd.*, pág. 89 líneas 2-5.
[107] *Íd.*, pág. 88 líneas 8-19.

ayudarlo.[108]   Se sintió muy mal porque él ama a los perros y ha rescatado muchos.[109]  Su única opción era sacarlo de ese sufrimiento,[110] por lo que apuntó a su cabeza y disparó por segunda ocasión.[111] Después de esto, Robert Philipps y Wissan Mouneyard le pegaron a sus bolas de golf, por lo que, como le tocaba su turno, también le pegó a la suya.[112] Es entonces cuando Wissan Mouneyard le dice "el perro aún se mueve". Al ver esto, fue a buscar su arma, se le acercó, y le disparó por tercera ocasión.[113] Aclaró que la motivación detrás de ese tercer tiro fue parar el sufrimiento del perro.[114]

En el contrainterrogatorio, admitió que, del propio video que tomó el apelante, surge que los perros estaban calmados cuando este se dirigía hacia ellos.[115] Y que, mientras se les continuaba acercando, éstos permanecieron calmados.[116] Además, reconoció ser rescatista de animales, y de haber ayudado a animales de la calle.[117] Finalmente, aceptó que, después de lo acontecido, se fue al hoyo 18 y continuó jugando.[118]

Evaluados los testimonios que anteceden, el Tribunal concluyó que el Sr. Zaveri Flores no actuó en legítima defensa, sino por un sentimiento de molestia, ya que él quería terminar su juego y el perro se lo impedía.[119]  Determinó que el apelante no tenía terror, puesto que éste se convirtió en un cuidador de perros y tiene perros de mascota.[120] Asimismo, razonó que la manifestación del apelante en cuanto a "vamos a brincar *(skip)* el hoyo" no demostraba terror de su parte, toda vez que dicha expresión no

---

[108] *Íd.*, pág. 90 líneas 12-24.
[109] *Íd.*, pág. 99 líneas 3-19.
[110] *Íd.*, pág. 103 líneas 3-7.
[111] *Íd.*, pág. 104 líneas 1-23.
[112] *Íd.*, pág. 107 líneas 12-22; pág. 108 líneas 4-6.
[113] *Íd.*, pág. 108 líneas 12-24; pág. 109 líneas 2-25; pág. 110 líneas 1-12.
[114] *Íd.*, pág. 107 líneas 12-22; pág. 108 líneas 4-6.
[115] TP de 10 de febrero de 2023, pág. 47 líneas 14-23.
[116] *Íd.*, pág. 48 líneas 11-25; pág. 49 líneas 1-4.
[117] *Íd.*, pág. 166 líneas 1-17.
[118] *Íd.*, pág. 171 líneas 9-12; pág. 172 líneas 7-13.
[119] TP de 16 de febrero de 2023, pág. 21 líneas 5-9.
[120] *Íd.*, pág. 13 líneas 6-16.

significa que él se quería ir del lugar, sino continuar su juego en un hoyo distinto.[121]

Para llegar a su conclusión, el foro *a quo* no tan solo consideró el testimonio de los compañeros del apelante que presenciaron el acto por el cual se le acusó, sino que también evaluó dos videos que tomó Wissan Mouneyard justo antes del acontecimiento.[122]

En el primer video, aparece el apelante montado en su carro de golf conduciendo en dirección a los tres perros.[123] Se puede observar a uno de los tres perros cuando comienza a ladrar y perseguir su carro.[124] En esa ocasión, el apelante da un viraje hacia la derecha acelerando su vehículo.[125] Se puede percibir cuando el perro deja de perseguirlo.[126] El carro del apelante se aleja y sale de la toma de la cámara mientras el perro que lo estaba persiguiendo permanece enfocado.[127] Se puede escuchar a Wissan Mouneyard mientras se ríe y le dice al apelante "shoot it", Salil", en son de broma.[128]

En el segundo video comienza enfocando al apelante, quien está montado en su carrito del golf con la mano izquierda en el volante y, en su mano derecha, sujetando un objeto que fue descrito como el arma de fuego.[129] Luego, cambia el enfoque hacia una vista panorámica del campo de golf, donde se observan los tres perros.[130]

Además, el foro primario pudo presenciar un video que fue tomado por el propio apelante,[131] en el cual se le observa

---

[121] *Íd.*, pág. 15 líneas 9-24.
[122] TP de 31 de enero de 2023, pág. 75 líneas 9-15.
[123] *Íd.*, pág. 81 líneas 5-18.
[124] *Íd.*
[125] *Íd.*
[126] *Íd.*
[127] *Íd.*
[128] *Íd.*, pág. 85 líneas 13-25; pág. 86 líneas 3-5.
[129] *Íd.*, pág. 89 líneas 19-25; pág. 90 líneas 1-3.
[130] *Íd.*, pág. 90 líneas 1-3.
[131] TP de 9 de febrero de 2023, pág. 39 líneas 14-24.

acercándose a los perros,[132] y cuando se le cae el teléfono,[133] porque uno de ellos lo comenzó a perseguir.[134]

Evaluado la totalidad del legajo apelativo, incluyendo las transcripciones de los testimonios vertidos en sala, concluimos que la "Sentencia" recurrida carece de error manifiesto, pasión, prejuicio o parcialidad alguna que permita nuestra intervención con la apreciación de la prueba que realizó el Tribunal de Primera Instancia. Por el contrario, la determinación recurrida constituye el balance más racional, justiciero y jurídico de toda la evidencia presentada.

De los testimonios ya discutidos, surge que, salvo el propio apelante, ninguno de los testigos oculares declaró que el perro estuviese en posición de atacar y brincar al carro de golf. Por el contrario, hasta el propio Tory Green declaró que, a pesar de que el perro lo persiguió, no sabía si estaba atacando o jugando. Incluso, también expresó que la muerte del perro le causó molestia, un indicativo de que nunca se sintió amenazado por el perro que le perseguía. Al igual que lo hizo el foro recurrido, entendemos que no puede existir "terror" en una persona que indicó que los perros le parecían bonitos *(cute)*, y que ha estado cerca de perros toda su vida y posee un largo historial con ellos.[135] No tan solo eso, sino que este fue quien optó por acercársele a los perros, no en una ocasión, sino en dos de ellas.

Asimismo, no puede tener "terror" una persona que ha jugado golf en ese lugar por unas 50 ocasiones,[136] y casi siempre veía los perros en jaurías.[137] Adicionalmente, sus expresiones en cuanto a "vamos a brincar *(skip)* el hoyo" no demuestran tal

---

[132] *Íd.*, pág. 47 líneas 1-5.
[133] *Íd.*, pág. 51 líneas 1-13.
[134] *Íd.*, pág. 47 líneas 6-21.
[135] *Íd.*, pág. 111 líneas 2-12.
[136] *Íd.*, pág. 78 líneas 2-14.
[137] *Íd.*

"terror",[138] puesto estas expresiones no tienen el efecto de abandonar el lugar por miedo, sino de moverse a un hoyo diferente, el cual está ubicado en el mismo parque de golf donde permanecen los perros realengos.

También, coincidimos con el foro primario en que el perro no estaba persiguiendo al apelante, sino al carro de golf en el que estaba transitando.[139] Ninguno de los testigos declaró que los perros estuviesen persiguiendo o atacando a las personas allí presentes. Por el contrario, la prueba demostró que, a pesar de que Robert Philipps estuvo parado a menos de quince pies de los perros, éstos nunca le hicieron nada. Sino que, los perros se limitaron a perseguir los carros donde conducían Tory Green y el apelante, sin que se demostrara que se le hubiese causado daños a alguno de ellos.

Por las razones que anteceden, no podemos concluir que existían unas circunstancias tan particulares que le hicieren creer al apelante que razonablemente iba a sufrir un daño inminente.

Empero, aun asumiendo que el apelante tenía dicha creencia, somos del criterio que no existía una necesidad racional de emplear un arma de fuego para impedir o repeler el daño. Máxime, cuando del video surge que el Sr. Zaveri Flores logró esquivar al perro en una primera ocasión con tan solo acelerar su vehículo. También, el propio apelante testificó que existían otros medios para defenderse del perro, como tirarle con agua o con las bolas que tenía en su carro.[140]

Por otro lado, entendemos que en este caso hubo provocación por parte del apelante. Como ya indicamos, los perros estaban tranquilos y jugando con una pelota. En ningún momento los perros se les acercaron a los testigos e intentaron hacerles

---

[138] TP de 16 de febrero de 2023, pág. 15 líneas 9 y 24.
[139] *Íd.*, pág. 14 líneas 9 y 10.
[140] TP de 9 de febrero de 2023, pág. 50 líneas 6-14.

daño. Sino que, fueron Tory Green y el apelante quienes se montaron en sus vehículos y manejaron hasta el lugar donde estaban los tres perros, provocando así que uno de estos les persiguiera. De hecho, Tory Green y el apelante expresaron que, tan pronto se alejaron lo suficiente, el perro dejó de perseguirlos.

Finalmente, concluimos que, al utilizar su arma de fuego, el Sr. Zaveri Flores infligió más daño que el necesario para repeler o evitar el daño. Como mucho, pudo haber disparado su arma de fuego al suelo, y de seguro los perros salían corriendo, como en efecto sucedió cuando ejecutó su primer disparo.[141] No era necesario dispararle directamente al animal, y mucho menos, efectuarle dos tiros cuando éste se encontraba ya en el suelo, sin representar amenaza alguna para el apelante.

Por todo lo anterior, determinamos que el Sr. Zaveri Flores no cumplió con los requisitos necesarios de una legítima defensa. Acorde lo anterior, los errores tres y cuatro tampoco fueron cometidos.

En su último señalamiento de error, el apelante alega que se le debió aplicar la figura del concurso ideal y/o medial, toda vez que, el hecho de disparar infringió dos tipos delictivos, esto es, el Art. 6.14 de la Ley Núm. 168-2019, *supra*, y el Art. 7 (a) de la Ley Núm. 154-2008, *supra*.

No obstante, nuestra Alta Curia ya ha expresado que las disposiciones relativas al concurso de delitos no aplican cuando exista una disposición especial que prohíba la formación de la pena agregada. *Pueblo v. DiCristina Rexach, supra*, a la pág. 794 En ese contexto, el Art. 6.01 de la Ley Núm. 168-2019, *supra*, expresamente dispone que "[t]odas las penas de reclusión que se impongan bajo esta Ley serán cumplidas consecutivamente entre sí y consecutivamente con las impuestas bajo cualquier otra ley".

---

[141] *Íd.*, pág. 88 línea 25; pág. 89 líneas 2-5.

En atención a lo cual, la teoría del concurso de delitos es inaplicable al caso que atendemos y, consecuentemente, no tiene méritos el argumento del apelante. Por tanto, el quinto error tampoco fue cometido.

**IV.**

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, confirmamos la "Sentencia" apelada, emitida por el Tribunal de Primera Instancia, Sala de Fajardo.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


                                        Lcda.  Lilia M. Oquendo Solís
                                    Secretaria del Tribunal de Apelaciones